**EDELSBERG LAW, P.A.**
Scott Edelsberg, Esq. (CA Bar # 330090)
scott@edelsberglaw.com
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (305) 975-3320

*Counsel for Plaintiff*

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JABARI SELLERS, *Individually and On Behalf of All Others Similarly Situated*, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BLEACHER REPORT, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Jabari Sellers on behalf of Plaintiff and all others similarly situated, files this Complaint against Defendant Bleacher Report, Inc. ("Bleacher Report" or "Defendant") for violation of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing its digital subscribers' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing video and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## I.     NATURE OF THE ACTION

1.     This is a consumer digital privacy class action complaint against Bleacher Report, as the owner of *Bleacherreport.com*, for violating VPPA by disclosing its digital subscribers' Personal Viewing Information to Facebook without obtaining the proper consent.

2.     VPPA prohibits "video tape service providers," such as *Bleacherreport.com*, from knowingly disclosing consumers' "personally identifiable information," which "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without first obtaining express consent in a stand-alone consent form. U.S.C. § 2710(a)(3), (b).

3.      Like other businesses with an online presence, Defendant collects and shares the personal information of visitors to its website and mobile application ("App") with third parties. Defendant does this through cookies, software development kits ("SDK"), and pixels. In other words, digital subscribers to *Bleacherreport.com* have their personal information disclosed to Defendant's third-party business partners.

4.      The Facebook pixel is a code Defendant installed on its *Bleacherreport.com* website allowing it to collect users' data. More specifically, it tracks when digital subscribers enter the *Bleacherreport.com* website or App and view Video Media. Defendant's website tracks and discloses to Facebook the digital subscribers' viewed Video Media, and most notably, the digital subscribers' FID. This occurs even when the digital subscriber has not shared (nor consented to share) such information.

5.      Importantly, Defendant shares the Personal Viewing Information—i.e., digital subscribers' unique FID and Video Media viewed—*together as one data point to Facebook*. Because the digital subscriber's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view digital subscribers' corresponding Facebook profile. Put simply, Facebook pixel grants Facebook knowledge of the Video Media each of its subscribers view on the *Bleacherreport.com* site.

6.   Defendant uses the Personal Viewing Information to build more targeted advertising on its website which, in turn, generates greater revenue. Thus, without obtaining consent from its digital subscribers, Defendant profits from its unauthorized disclosure of its digital subscribers' Personal Viewing Information to Facebook. Defendant reaps these secret profits at the expense of its digital subscribers' privacy and their statutory rights under VPPA.

7.   Because Defendant does not clearly and conspicuously inform *Bleacherreport.com* digital subscribers about this dissemination of their Personal Viewing Information—indeed, the process is automatic and *invisible*—they cannot exercise reasonable judgment to defend themselves against the highly personal ways *Bleacherreport.com* has used and continues to make money by using their personal data.

8.   Defendant chose to disregard Plaintiff's and hundreds of thousands of other *Bleacherreport.com* digital subscribers' statutorily protected privacy rights by releasing their sensitive personal data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## II.   JURISDICTION AND VENUE

9.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Defendant resides in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## III.    PARTIES

12.     Plaintiff Jabari Sellers is an adult citizen of Tennessee and is domiciled in Davidson County, Tennessee. Plaintiff began his digital subscription to *Bleacherreport.com* around 2007 and continues to maintain the subscription to this day. Plaintiff has had a Facebook account from approximately 2005 to the present. During the relevant time period he has used his *Bleacherreport.com* digital subscription to view Video Media through the *Bleacherreport.com* website and/or App while logged into his Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information.

13.     Defendant is an American media company focused on sport and sports culture with its headquarters in San Francisco, California. Defendant develops,

owns, and operates the *Bleacherreport.com* website, which includes a broad selection of video content posted along with their stories.

## IV.    FACTUAL ALLEGATIONS

## A.    Background of the Video Privacy Protection Act

14.    VPPA generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees. *Id.* at § 2710(c).

15.    VPPA was initially passed in 1988 to protect the privacy of individuals' and their families' video rental, purchase and viewing data. Prior to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

16.    Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive

form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.    In proposing the Video and Library Privacy Protection Act, later codified as VPPA, Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

18.    While these statements rang true in 1988 when VPPA was passed, the importance of legislation like VPPA in the modern era of data mining from online activities is even more pronounced. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the

'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

19.    In this case, Defendant chose to deprive Plaintiff and the Class members of that right by systematically disclosing their Personal Viewing Information to Facebook, without providing clear and conspicuous notice to or obtaining proper consent from its digital subscribers.

**B.    *Bleacherreport.com's* Digital Subscriptions**

20.    To subscribe for *Bleacherreport.com*, users sign up for an online newsletter. *Bleacherreport.com* users provide their personal information, including but not limited to their name, email address, and phone number. Below are screenshots of *Bleacherreport.com's* subscription process:



---

[1] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury (last accessed March 15, 2022).





21.    Defendant's sign-up process fails to bind its digital subscribers to its Privacy Policy and Terms and Conditions because it is an unenforceable browserwrap agreement.

22.    First, Defendant's website does not provide reasonably conspicuous notice of the terms to which the consumer will be bound. The notice is displayed in a tiny gray font considerably smaller than the font used in the surrounding website

elements that is barely legible to the naked eye, while the comparable larger font used in all of the surrounding text naturally directs the user's attention everywhere else. The textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable text.

23.     Second, Defendant's website is not designed to obtain Plaintiff's unambiguous manifestation of assent to the terms of its Privacy Policy and Terms of Use. Reasonable consumers would conclude that, by clicking the large "Continue" button, they are signing up for the website, but not that they are agreeing to the Terms of Use and Privacy Policy. The design of the website and App leads the consumer to enter their phone number and then click "continue," without necessarily viewing the sentence in barely legible font beneath the "continue" button which states that, "By selecting 'Continue' you agree to the terms and conditions of the Bleacher Reports Terms of Use and Privacy Policy."

24.     Further, the sentence below the "continue" button stating, "By selecting 'Continue' you agree to the terms and conditions of the Bleacher Reports Terms of Use and Privacy Policy," does not contain a link to a distinct and separate legal document that notifies Defendant's subscribers that it will record their Personal Viewing Information or obtains their consent to disclose it to third parties. Thus, when opening an account, Defendant does not disclose "in a form distinct and separate from any form setting forth other legal or financial obligations of its [digital

subscribers]" that it will share their Personal Viewing Information with third parties, such as Facebook.

25.     Bleacher Report operates a website in the U.S. accessible from a desktop and mobile device at *Bleacherreport.com*. It also offers an App available for download on Android and iPhone devices.

26.     On information and belief, all digital subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

27.     Digital subscribers may also provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

28.     After becoming a digital subscriber, viewers have access to a variety of *Bleacherreport.com's* Video and Audio Media on Defendant's digital platform.

29.     Notably, once a digital subscriber signs in and watches *Bleacherreport.com* Video Media, the digital subscriber is not provided with any notification at the time that they watch the Video Media that their Personal Viewing Information is being shared.

30.     Defendant also does not provide its digital subscribers with an opportunity, in a clear and conspicuous manner, for them to withdraw on a case-by-case basis from the disclosure of their Personal Viewing Information or to withdraw from ongoing disclosures, at their election.

C. **Defendant Admits It Collects and Discloses Certain Personal Information of Digital Subscribers to Third Parties but Fails to Advise It Discloses Personal Viewing Information, as VPPA Requires.**

31.     The operative Privacy Policy for *Bleacherreport.com* states that it collects types of "Information" from its user's devices for them to access their service:

> We may collect different types of information during your interactions with our Sites and through our advertising and media across the Internet and mobile apps. This information may include personal information (e.g., name, phone number, postal address, email address, and certain payment information), technical information (e.g., device identifier, IP address, browser type, operating system) and usage information (e.g., how you use and navigate to and from our Sites, and information about content or advertisements you have been shown or have clicked on). We may combine these types of information together, and collectively refer to all of this information in this Privacy Policy as "Information." Information may be collected as described below and through the use of cookies, web beacons, pixels, and other similar technologies by us or by other companies on our behalf. Below we describe the types of Information we may collect:
>
> **Registration, account, and sign-up information.** We may collect Information in the course of your use of, or registration with, our Sites. For example, when you create an account, register for or download an app, or sign-up for a product or service, you may provide us with certain personal information. This type of personal information may include name, phone number, postal address, fax number, email address, or certain payment information (e.g., billing and transaction information). We may also collect Information about your interest in and use of various products, programs, services, and content available on or through our Sites.
>
> [...]
>
> **Information from other sources.** On occasion, we combine Information with other online information we receive, including usage information about your interactions with other websites and with online advertising and media. We also supplement or combine Information with Information from a variety of other sources or outside records,

including third-party data providers that provide us with Information such as demographics, transaction and purchase history, Information about the content and advertisements you interact with, or inferences about your demographics or preferences. We may receive Information from third parties with which you have a subscription agreement that includes access to our content or services, such as a cable or smart device provider.

**Information you provide through social media.** You can engage with some of our content and offerings, such as videos, games, apps, and other offerings on or through third party communities, forums, and social media sites, platforms, services, plug-ins, and applications ("Social Media Sites"). When you link to or interact with our Sites, content, or offerings through Social Media Sites, you may allow us to receive certain Information from your social media account (e.g., name, user ID, email address, profile photo, photos and videos, gender, birthday, location, your friends and their contact details, people you follow and/or who follow you, posts, 'likes', or other user-generated content). We may also receive Information from your interaction with our content (e.g., content viewed, game performance, high scores, and information about advertisements you have been shown or have clicked on). By providing this Information or otherwise interacting with our Sites through Social Media Sites, you consent to our use of Information from the Social Media Sites in accordance with this Privacy Policy. For information about how you can customize your privacy settings on Social Media Sites, and how those Social Media Sites handle your personal information and content, please refer to their privacy help guides, privacy policies, and terms of use.

[…]

**Video and streaming information.** For some Sites, we collect information about the films, TV shows, and videos that you view. For example, if you stream video content using our Sites, we may collect information about your interaction with that content or service, such as the title and genre, watchlists you compile, and searches you conduct, duration and number of streams and downloads and system information related to streaming and download quality.

*See* https://www.warnermediaprivacy.com/policycenter/b2c/WMNS/en-us/

(last accessed January 18, 2023).

32.    Thus, Defendant's Privacy Policy informs consumers that they will be collecting their Personal Viewing Information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

33.    With respect to the sharing and disclosure of "Information" the Privacy Policy indicates:

> **Business partners and third parties**. We may also share Information with business partners and third parties (e.g., other companies, retailers, research organizations, advertisers, ad agencies, advertising networks and platforms, participatory databases, publishers, and non-profit organizations) that may want to market products or services to you. *If we share personal information with such unaffiliated third parties for their own marketing purposes, we provide you with an opportunity to opt out of such uses either at the point of collection or through the choice mechanisms set forth in this Privacy Policy.* To learn more about your choices, please see our Your Choices and Controls section below.

34.    The "Information" section of the Privacy Policy is not "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer."

35.    Defendant does not provide its digital subscribers with the ability to consent to the disclosure of their personally identifiable information at the time the disclosure is sought, i.e., at the point when a subscriber views a video on Defendant's website.

36.    The "Your Choices and Controls" section of the Privacy Policy purports to obtain Defendant's digital subscribers' advance consent to disclose their personally identifiable information. However, the Privacy Policy elicits a digital

subscriber's consent forever, while VPPA only allows that consent to be given "for a set period of time, not to exceed 2 years." Thus, even if Plaintiff agreed to the Privacy Policy when he signed up for Defendant's website in 2007, any consent he may have given does not cover time periods more than two years from the date he subscribed.

37.    Defendant also does not provide an opportunity, in a clear and conspicuous manner, for its digital subscribers to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, as the consumer's election. Buried in a section of the Privacy Policy entitled "Ad Choices," Defendant discloses that "[t]o opt out of our own collection, use, and transfer of data as described above for interest-based or targeted advertising, please visit our Opt-Out page (https://www.warnermediaprivacy.com/opt-out/) to opt-out." This link sends consumers to another webpage where consumers are given three options: (1) to "opt out from targeted advertising if your email address was collected and associated with an ad profile in WarnerMedia internal systems;" (2) to "opt out of targeted advertising by third parties that participate in self regulatory programs; "and (3) to opt out of "targeted advertising on mobile apps." Thus, this website discloses to consumers that they can opt out of "targeted advertising," but does not clearly and conspicuously explain if the opt out will stop Defendant from collecting and disclosing to third parties the collection of the "personally identifiable information" VPPA protects.

38.     Defendant's Privacy Policy does not relieve Defendant of VPPA liability for disclosing "personally identifiable information concerning any consumers" because it fails to comply with the requirements set forth in 18 U.S.C. § 2710(b)(2) for such disclosure, including the requirements of section 2710(b)(2)(B), which must *all* be met for disclosure to be lawful.

**D.     How *Bleacherreport.com* Disseminates Digital Subscribers' Personal Viewing Information**

**1.     Tracking Pixels**

39.     Websites and apps use Facebook's pixel and SDK to collect information about user's devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

40.     The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is an *invisible* tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website advertiser tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

41.     Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it benefits financially from the advertising and information services that stem from use of the pixel. The pixel allows Facebook to build detailed profiles

about a website's users as those users browse the Internet to enable advertisers to serve them with targeted advertisements.

42.    When a *Bleacherreport.com* digital subscriber enters the website and watches Video Media on the website, the website sends to Facebook certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, *Bleacherreport.com* sends to Facebook the video content name, its URL, and, most notably, the viewers' Facebook ID.

## 2.    Facebook ID ("FID")

43.    An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies on his or her browser views Video Media from *Bleacherreport.com* on the website or app, *Bleacherreport.com*, through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into *Bleacherreport.com's* website or App.

44.    Defendant could easily program its website and App to prevent its users' Personal Viewing Information from being automatically transmitted to Facebook when a subscriber views Video Media. However, it is not Defendant's

financial interest to do so because it benefits financially by providing this highly sought-after information.

45.     Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person can learn the identity of the digital subscriber and the specific video or media content they requested on *Bleacherreport.com's* website. In other words, by obtaining a person's FID, any third-party can discover exactly which videos that person watched on Defendant's website, which is exactly the type of personally identifiable information that VPPA is intended to protect from unauthorized disclosure.

46.     At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled *Bleacherreport.com's* website and App to show targeted advertising to its digital subscriber's based on the products those digital subscriber's had previously viewed on the website or App, including Video Media purchases, for which Defendant received financial remuneration.

**E.**   ***Bleacherreport.com* Unlawfully Discloses Its Digital Subscribers' Personal Viewing Information to Facebook**

47.   Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

48.   Defendant is not sharing anonymized, non-personally identifiable data with Facebook, as it represents. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information—Facebook—*receives the Personal Viewing Information as one data point*. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

49.   Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

50.   Here's how it works. A user visits *Bleacherreport.com* website and clicks on an article and watches the video in the article. Once the user clicks on and watches the video in the article, *Bleacherreport.com* sends the content name of the

video the digital subscriber watched, the URL, and the digital subscriber's FID to Facebook.

51.    As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

52.    Defendant does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

53.    By disclosing its digital subscribers Personal Viewing Information to Facebook—which undeniably reveals their identity and the specific video materials they requested from Defendant's website—Defendant has intentionally and knowingly violated VPPA.

**F.    Defendant Does Not Need to Disclose Personal Viewing Information to Operate its Website and App**

54.    Tracking pixels are not necessary for Defendant to operate *Bleacherreport.com's* digital news publications and sign-up digital subscriptions. They are deployed on Defendant's website for the sole purpose of enriching Defendant and Facebook.

55.    Even if an on-line news publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing

Information to Facebook. In any event, if Defendant wanted to do so, it must first comply with the strict requirements of VPPA, which it failed to do. As noted above, even Facebook forbids the disclosure of such information without first complying specifically with VPPA (and relevant state laws).

## G.   Plaintiff's Experiences

56.   Plaintiff Jabari Sellers has been a digital subscriber of *Bleacherreport.com* from approximately 2007 to the present. Plaintiff became a digital subscriber of *Bleacherreport.com* by providing, among other information, his name, address, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. As part of his subscription, he receives emails and other news from *Bleacherreport.com*.

57.   Plaintiff has had a Facebook account since approximately 2005. From 2007 to the present, Plaintiff viewed Video Media via *Bleacherreport.com's* website and App.

58.   Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

59.     Because Plaintiff is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff of the full set of benefits to which he was entitled as part of being a *Bleacherreport.com's* digital subscriber.

## V.     CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action on behalf of himself and all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website and/or App owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant.

Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

61.     <u>Numerosity</u>. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Upon information and belief, hundreds of thousands of members of the Class are widely dispersed throughout the United States. Class members can be readily identified from Defendant's records and non-party Facebook's records.

62.     <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful

conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without Plaintiff's or Class members' obtaining express written consent. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

63.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

64.    <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a)    Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)    Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)     Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)     Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

(e)     Whether the Class is entitled to damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred, and other preliminary and equitable relief as the court determines to be appropriate, as a result of Defendant's conduct.

65.     <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.    CLAIM FOR RELIEF

## FIRST CLAIM FOR RELIEF
### Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710

66.     Plaintiff incorporates paragraphs by reference as if fully set forth herein.

67.     VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

68.     As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

69.     Defendant is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

70.     As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

71.     Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This

information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed *Bleacherreport.com* Video Media, including the specific video materials requested from the website.

72.     As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to a digital *Bleacherreport.com* plan that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

73.     As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent under this definition.

74.     In addition, VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide,

in a clear and conspicuous manner, an opportunity for consumers to opt out as required by VPPA.

75.     Defendant knew that these disclosures identified Plaintiff and Class members to Facebook. Defendant also knew that Plaintiff's and Class members' Personal Viewing Information was disclosed to Facebook because, *inter alia*, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

76.     By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

77.     As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VII.   RELIEF REQUESTED

78.     Accordingly, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court:

(a)     Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class and his counsel as Class Counsel;

(b)     Declare that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)     Order Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d)     Order Defendant to pay punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e)     Order Defendant to pay prejudgment interest on all amounts awarded;

(f)     Order Defendant to pay restitution and all other forms of equitable monetary relief;

(g)     Provide for injunctive relief as pleaded or as the Court may deem proper; and

(h)     Enter an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## VIII.   JURY DEMAND

79.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.


Dated:        January 25, 2023          Respectfully submitted,

**EDELSBERG LAW,  P.A.**

*/s/ Scott Edelsberg, Esq.*
Scott Edelsberg, Esq.
CA Bar No. 330090
scott@edelsberglaw.com
Adam A. Schwartzbaum, Esq.*
Florida Bar No. 93014
adam@edelsberglaw.com
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Tel: 305-975-3320

**SHAMIS & GENTILE, P.A.**

Andrew J. Shamis, Esq.*
Florida Bar No. 101754
ashamis@shamisgentile.com
Edwin E. Elliott, Esq.*
Florida Bar No. 1024900
edwine@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, FL 33132

*Pro Hac Vice* forthcoming

*Counsel for Plaintiff and the Proposed Class*